soning of Judge Marcy in this case was criticised and rejected by the late Justice McLean (see Lincoln v. Tower [Case No. 8,-355]), and by the supreme court of the state of Michigan (see Wilcox v. Kassick, 2 Mich. 165); but in many of the states it has been followed and approved. In order to properly understand the decision given in Starbuck v. Murray, it is necessary, in my opinion, to examine the law and practice existing at that time in the state of New York in regard to the manner of making up the judgment record; for this practice undoubtedly influenced the court in its decision. It will be found, upon examination, that, by the practice in the courts of that state, the attorney of the prevailing party prepared the judgment record out of court, after the suit had terminated; and the entries were made by him, and not by a particular officer in court. The supervision of the court over the whole course of action was not required by this practice, and the entries, therefore, in a judgment record were such as the attorney saw fit to insert, although by a fiction everything was supposed to be entered in open court. See Grah. Prac.; Burrill, Prac. tit. "Judgments in General," etc. There was very good reason, therefore, for permitting a defendant in a suit upon a judgment rendered in the courts of that state to contest any jurisdictional fact, even to the extent of contradicting the statement of personal service of process, or any fact which showed jurisdiction of the person. The record in all its parts was the act of the attorney, and did not bear the impression of absolute verity. It is true this case (Starbuck v. Murray), goes to the full extent of deciding that, notwithstanding the record, any jurisdictional fact may be inquired into; but to my mind it is clear that Judge Marcy had in view the practice with which he was most familiar, and what he said had reference to the status of judicial records similarly situated to those of the state of New York.

The authorities compiled by Mr. Bigelow in his excellent work on "Estoppel," seem to me to justify the conclusion laid down by him, viz.: "If the allegations in the record as to jurisdiction could not be disputed in the sister state, they must be conclusive throughout the Union," and "We should state the rule to be, that where the record contains an allegation of specific facts sufficient to constitute jurisdiction, parties and privies are estopped to deny the jurisdiction in a suit for the same cause of action, unless the record would be inconclusive in an action upon the judgment in the state in which it was rendered." Bigelow, Estop. p. 237, and preceding title, "Foreign Judgments in Personam." In Indiana, this record would be conclusive between the parties without doubt. 23 Ind. 628; 2 Blackf. 108. A case on all fours with the one at bar has been decided in that state, upholding the conclusive-

ness of the judgment of a sister state, where the record alleges personal service of summons. Westcott v. Brown, 13 Ind. 83, explaining Boylan v. Whitney, 3 Ind. 140, cited by defendants' counsel. See, also, Roberts v. Caldwell, 2 Dana, 512; 3 Gilman, 197.

The defendants, therefore, in my opinion, are not entitled to a new trial. Motion denied.

[NOTE. On a writ of error, this case, so far as it concerned the defendant Alfred H. Knowles, was brought before the supreme court. Mr. Justice Bradley, delivering the opinion of the court, remarked that the defendant had a perfect right to prove that he had never been served with process, and that the Cass county circuit court, Ind., never acquired jurisdiction of his person. A venire de novo was awarded. 19 Wall. (86 U. S.) 58.]

## LOGS OF.

[Note. Cases cited under this title will be found arranged in alphabetical order under the quantity or number of logs; e. g. "Logs of Cedar. See Two Hundred and Sixty-Eight Logs of Cedar, Case No. 14,295."]

## Case No. 8,468.

### The LOLA.

[6 Ben. 142.][1]

District Court, E. D. New York. June, 1872.

SEAMAN'S WAGES—AGREEMENT OUTSIDE THE SHIPPING ARTICLES—DURESS.

1. The shipping articles are not conclusive evidence of the contract of a sailor with the ship.

2. Effect must be given to an agreement by the shipping agent, made at the time the sailor signed the articles, and understood by the sailor to form part of the agreement, but not embraced in the articles.

3. A seaman signed articles in New York, on board a British vessel, for a voyage to Dunkirk, at $40 a month. At the time, it was stated to him that the voyage would end in New York. On the arrival of the vessel at Dunkirk, the seaman was discharged and reshipped at $20 a month. On the return of the vessel to New York, he left her, and brought suit for his wages: Held, that the agreement by the seaman was that the voyage should end in New York; that the subsequent agreements made by him, were made under duress, and were not binding on him; that he had the right to leave the vessel on her return to New York, and was entitled to be paid at the rate of $40 a month.

The libellant in this case alleged that he shipped on board the Lola, in New York, at the rate of $40 a month, for a voyage to a port in Great Britain, thence to a port in the Mediterranean, and back to New York; that the vessel sailed from New York to Dunkirk, in France, where the master wrongfully discharged him, but offered to reship him for $20 a month, which he accepted under duress; that the vessel sailed from Dunkirk to Swansea, where he signed articles at $20 a month, and after he had signed them learned that they were articles for a voyage to New York, and back to a

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

port in Europe; and that the vessel then came to New York, and there the libellant left her, the voyage for which he originally shipped being completed. And the libellant claimed to recover wages at $40 a month, for the voyage. The owners of the ship denied the agreement first alleged, and set up that the libellant shipped in New York, and signed articles for a voyage to Dunkirk only, and was there paid off, and discharged, and reshipped and made the other agreements alleged by him, and that his leaving the ship in New York, where he did, was a desertion, which forfeited all wages due him.

Henry Morris, for libellant.
Goodrich & Wheeler, for claimants.

BENEDICT, District Judge. I have no doubt as to the proper decision to render in this case. The question to be determined first, is, what was the contract made by the libellant, when he shipped in New York. The shipping articles are not the sole evidence of that contract, for effect must be given to an agreement by the shipping agent, made at the time when the articles were signed, and understood by the seamen to form part of the contract, where such agreement is clearly proved. Statements, representations and agreements made with seamen by shipping notaries, when the articles are signed, bind the ship, and that without reference to the instructions which the captain has given the notary. When the ship owner allows a shipping agent to employ a crew for him, he holds out to the seamen, that the shipping agent has authority to bind the ship by the contract which he makes. So, whatever was the bargain made in this case, between Ferris, the shipping agent, and this man, at the time of the shipment in New York, that binds the ship.

Now that bargain is proved not only by the libellant, but also by the landlord. They both say that the bargain was that he should go on a voyage, which they describe, which voyage was to end in New York, and at $40 a month wages. I see no reason to doubt this evidence. The landlord has been examined in court, and appears reliable, and says that he asked the shipping agent himself what the voyage was, and was told that it ended in New York, in which the landlord simply did his duty by the sailor. This contract is not denied by Ferris, the shipping master, who gave his evidence with very proper frankness. He says that he don't recollect what he did say, and cannot swear that he didn't make the contract which the libellant swears to. There is no improbability in the statement of such a contract, because Ferris says such understandings were common in this class of vessels. There would be improbability in any other understanding, because this man had a family here, and he had shipped several times out of this port, and would not be very likely

to make a contract to be left in a foreign and strange port. The rate of wages is consistent with the libellant's story, for although cooks were shipped at thirty-five dollars a month, yet it is quite clear from Ferris' statement that they were shipped at from $35 to $40, and this man got $40. That the agreement was as the libellant states, is further clearly indicated by the way the man acted when the captain proposed to discharge him in France. He was quite excited about it, and cried, and applied to the mate to induce the captain not to leave him there. It is manifest that when he shipped he never thought of being left in that place.

The talk about incompetency in the case amounts to nothing. The captain took the man through the whole voyage as cook and steward, and offers no proof of any neglect of his duties. The captain says he did not like him—and quite likely he did not like him as well at $40 a month as he would have at $20. He was satisfied with him at that rate. It is said the man expressed himself as thankful to continue in the ship at the reduced wages. Of course he was, because the captain had threatened to use the power which he possessed, to leave him behind in a strange place, and he, of course, made no subsequent complaint, and when asked, signed new articles at $20 a month, without objection.

But these subsequent articles amount to nothing. They were all executed under duress in law, and do not bind the seaman. The contract which he made when he shipped for the voyage which he performed is the only contract binding upon him; and when he completed that voyage in New York he had a right to leave the ship and demand his wages, at the rate which I find upon the evidence the ship agreed to pay him, namely, $40 a month.

Let there be a decree for the libellant for the wages at $40 a month, less any payments made to him.

LOMAX (FRAZIER v.). See Case No. 5,072.
LOMBARD (AMERICAN WHIP CO. v.). See Case No. 319.

## Case No. 8,469.
### LOMBARD v. BAYARD.
[1 Wall. Jr. 196.] [1]
Circuit Court, E. D. Pennsylvania. April Term, 1848. [2]

LIEN OF JUDGMENT IN CIRCUIT COURTS — DUTIES AND COMPENSATION OF AUDITORS—RATES OF PROFESSIONAL CHARGES.

1. The lien of a judgment in this court is co-extensive with the district, and is not confined to the county of Philadelphia merely.

[Cited in Cropsey v. Crandall, Case No. 3,418; Ludlow v. Clinton Line R. Co., Id. 8,600; Ward v. Chamberlain, 2 Black (67 U. S.) 438.]

---

[1] [Reported by John William Wallace, Esq.]
[2] [Affirmed in 9 How. (50 U. S.) 530.]